[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10313

_____

THANQUARIUS R. CALHOUN,

Petitioner-Appellant,

*versus*

WARDEN, BALDWIN STATE PRISON,
COMMISSIONER, GEORGIA DEPARTMENT OF CORREC-
TIONS,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

D.C. Docket No. 3:21-cv-00019-CDL-CHW

_____

Before WILLIAM PRYOR, Chief Judge, ABUDU, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Thanquarius Calhoun led police officers on a reckless, high-speed chase that resulted in a crash and the death of a passenger in his car. Calhoun was charged with and convicted by a jury of eight crimes arising from his flight and the crash, including felony murder. After his convictions and sentence of life imprisonment were affirmed by the Supreme Court of Georgia, Calhoun filed a federal habeas petition. This is his appeal from the district court's denial of his petition. The primary issues he has raised in this appeal depend on Georgia law questions that were decided against him by the state's highest court on direct appeal. That lets you know how this appeal is going to come out.

**I.**

It all began when Calhoun, driving over 95 miles per hour in a 70 mile-per-hour zone on an interstate highway, sped past an officer in an unmarked car. The officer activated his car's blue lights and siren and gave chase. Instead of pulling over, Calhoun accelerated. He had two other people with him in his car. One in the front passenger seat and another in the back seat.

A number of other officers joined the chase, but Calhoun thwarted their initial attempts to stop him. The officers tried to

box in his car by surrounding it with theirs — a tactic known as a "moving roadblock" — but that didn't work. They also tried to stop his car with stop sticks (a tire deflation device), but that didn't work either.

Calhoun raced on at speeds of more than 115 miles per hour, weaving through traffic, turning in front of other vehicles, and using the emergency lane to pass other cars. At one point, he drove through a Department of Transportation construction site, slowing down only "a minimal amount" before resuming his breakneck speed. At another point, he swerved out of the way of an officer who was stopping traffic in one of the lanes. Calhoun's last-minute swerving forced another officer who was in the chase to plow his car through the median to avoid running over the officer who was stopping traffic.

The chase lasted for 21 miles, and during it Calhoun averaged a speed of 90 miles per hour, which was more than 20 miles an hour above the speed limit. His top speed of 118 miles an hour was almost 50 miles an hour above the speed limit. Throughout the chase Calhoun drove erratically, recklessly, and dangerously in his efforts to escape the pursuing officers.

Having learned of the chase, Georgia State Patrol Post Commander Al Whitworth and Trooper Donnie Saddler waited in their respective patrol cars for Calhoun to get where they were located further down the highway. Because Calhoun had thwarted every technique used thus far in the effort to stop him, and he was speeding toward a particularly busy exit, Whitworth radioed Saddler that

"if [they] ha[d] the opportunity and there [was] a safe way, [they would] use the PIT maneuver" to bring Calhoun's car to a halt.

The PIT ("Precision Immobilization Technique")[1] maneuver is a technique used by law enforcement officers to stop fleeing vehicles. To execute the PIT maneuver, an officer matches the speed of the fleeing vehicle with his patrol car and "tap[s]" its left or right rear bumper, causing the vehicle to spin out.

After Post Commander Whitworth and Trooper Saddler both joined the pursuit, Saddler got his patrol car close enough to use the PIT maneuver on Calhoun's vehicle, which was then driving at 111 miles per hour. The PIT maneuver caused Calhoun's vehicle to travel off the right side of the roadway, strike a ditch, and flip over. Calhoun and the backseat passenger survived the crash, but front seat passenger Marion Shore was killed.

As for Calhoun's motive in fleeing so desperately, during the chase, counterfeit $100 bills were flying from his car and littering parts of the roadside. *See Calhoun v. State*, 839 S.E.2d 612, 619 (Ga. 2020) ("[T]he counterfeit bills were relevant to explain why Calhoun engaged in such dangerous behavior leading up to the fatal crash."). Still more counterfeit bills were found "within the debris of the wreck scene." Not only that, but "just two weeks before this incident, Calhoun had been involved in a different high-speed chase," and by the time of this trial he had been charged with

---

[1] In the record, this is sometimes referred to as the "Precision Intervention Technique" or the "Pursuit Intervention Technique."

fleeing or attempting to elude a police officer, reckless driving, and speeding stemming from his earlier flight from officers. *Id.* at 618. And his driver's license had also been suspended. *Id.* at 615.

## II.

For his criminal behavior during this latest flight from officers, Calhoun was charged with felony murder, homicide by vehicle in the first degree, fleeing or attempting to elude a police officer, reckless driving, speeding, failure to maintain his lane, driving with a suspended license, and failure to wear a seatbelt. The felony murder and the homicide by vehicle charges grew out of the death of his passenger, Marion Shore. The felony that provided the basis for Calhoun's felony murder charge was the fleeing or attempting to elude a police officer charge.

At trial both Post Commander Whitworth and Trooper Saddler testified during direct examination by the prosecution about the use of the PIT maneuver. Whitworth testified that before deciding to use it, officers should consider how much traffic is on the roadway, any pedestrian traffic on either side of the roadway, and any obstacles on the side of the roadway such as trees or businesses.

Saddler testified that when he was trained on using the PIT maneuver the vehicles were traveling at thirty-five miles per hour, but there was no Georgia State Patrol guideline on the maximum speed at which the maneuver could be performed. He also explained that when deciding to perform the PIT maneuver, officers should consider the danger of the situation, the reason the vehicle was fleeing, and any potential danger to the public that the

maneuver would cause.  During cross-examination, Saddler was not questioned further about whether it is safe to perform the PIT maneuver at high speeds or the factors an officer should consider when deciding whether to use the maneuver in a given circumstance.

During his closing argument, defense counsel argued that before Calhoun could be convicted of felony murder, "[t]he State has to prove that whatever Mr. Calhoun did[,] it caused Marion Shore to die."  He also argued that Trooper Saddler was the "sole cause of Marion Shore's death."  In its closing argument the State argued that "[t]he ultimate issue for [the jury] to decide in this case is did the defendant's actions by fleeing or attempting to elude a police officer cause the death of Marion Shore."  The State told the jurors that they could watch the video of the chase and see that it was foreseeable that someone could die as a result of Calhoun's reckless driving.

Defense counsel did not request a jury charge on proximate cause even though Georgia's felony murder statute and homicide by vehicle statute each requires proof of it to impose criminal liability.  *See Wilson v. State*, 883 S.E.2d 802, 809 (Ga. 2023); *Hartzler v. State*, 774 S.E.2d 738, 742 (Ga. Ct. App. 2015).  Instead of instructing the jury on proximate cause specifically, the court instructed the jury that "a person commits the crime of felony murder when, in the commission of a felony, that person causes the death of another human being."  Defense counsel did not object to that instruction. The judge also charged the jury that "fleeing and attempting to

elude a police officer constitutes a felony" when the fleeing person "operates his vehicle in excess of 20 miles an hour above the posted speed limit or flees in traffic conditions which place the general public at risk of receiving serious injury."

The jury found Calhoun guilty on all counts and the court sentenced him to life in prison without the possibility of parole.

**III.**

Calhoun eventually filed a motion for a new trial contending that he did not receive effective assistance of counsel. *See Calhoun*, 839 S.E.2d at 614 n.1 (recounting the appellate history and the remand necessary for consideration of that motion). In his motion, Calhoun complained that his defense counsel, Joe Louis Brown, Jr., failed to present a proximate/intervening cause defense to the felony murder charge and did not request a jury instruction on it. He argued that if Brown had presented the defense that the PIT maneuver was an intervening cause in Shore's death, he would not have been convicted of felony murder.

At the hearing on the motion for new trial, Calhoun offered testimony from Stephen S. Rushton, a troop commander for the Georgia State Patrol who trained Trooper Saddler on how to conduct the PIT maneuver in 2012. He testified that the Georgia Public Safety Training Center conducts PIT maneuver training at 35–45 miles per hour because it would be dangerous and ineffective to train at higher speeds. Rushton also testified that in some circumstances, where the driver's identity is known and he does not pose a threat to public safety, the prudent course is to discontinue the

pursuit and attempt to arrest the suspect with a warrant later. He explained that when deciding whether to execute the PIT maneuver, officers should weigh the danger of letting the fleeing vehicle escape against the danger of executing the maneuver, and that the risk to passengers in the fleeing vehicle should be considered in this calculus. Trooper Saddler testified that although the maximum speed at which he had trained to perform the PIT maneuver was 35 miles per hour, he had executed the maneuver at over 100 miles per hour in the field prior to conducting the maneuver here.

Calhoun also presented at the hearing the testimony of Dr. Geoffrey Alpert, a sociologist and criminology professor whom he had retained to testify about police procedure related to the PIT maneuver. Dr. Alpert testified that it is unsafe to perform the PIT maneuver when a fleeing vehicle is driving over 40 miles per hour and that most police departments limit its use to 35 miles per hour.

After considering all of the evidence, the trial court denied Calhoun's motion for a new trial, determining that he had failed to establish either the deficient performance or prejudice prong of an ineffective assistance of counsel claim.

Calhoun appealed his conviction and the denial of his motion for a new trial to the Supreme Court of Georgia. *Calhoun*, 839 S.E.2d at 615. The Court stated that to succeed on his ineffective assistance of counsel claim, Calhoun had to "show that his lawyer performed at trial in an objectively unreasonable way" and also that the lawyer's "deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious that

they likely affected the outcome of the trial." *Id.* (quotation marks omitted).  The Court concluded that Calhoun had not met that dual burden.  *Id.* at 616–19.

Calhoun argued that on the felony murder charge "trial counsel should have focused on developing a defense establishing that the PIT maneuver was an intervening cause of Marion Shore's death," which would have ruled out the proximate cause element of that crime.  *Id.* at 616 (quotation marks omitted).  The Supreme Court of Georgia assumed without deciding that counsel's performance was deficient in that regard, but it held that the claim still failed because Calhoun had not established he had suffered prejudice as a result.  *Id.* at 616–17.

The Court explained that: "Proximate cause exists when the accused's act or omission played a substantial part in bringing about or actually causing the victim's injury or damage and the injury or damage was either a direct result *or a reasonably probable consequence of the act or omission.*"  *Id.* at 616 (alteration omitted) (quotation marks omitted).  A defendant's action sometimes is not the "legal cause" of the injury or damage if some other act "intervenes."  *Id.* (quotation marks omitted).  But if the intervening act "could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act."  *Id.* (quotation marks omitted).  In other words, proximate cause is not affected by a reasonably foreseeable intervening cause.

The Supreme Court of Georgia determined that Calhoun did not present enough evidence — at trial and in the hearing on the motion for a new trial combined — to establish that Trooper Saddler's use of the PIT maneuver was an intervening cause that severed the causal chain linking Calhoun's actions with Shore's death. *See id.* at 616–17. At most, the Court held, the evidence showed that he may have been negligent in performing the PIT maneuver, and the negligence of a third party is "generally insufficient to constitute [an] intervening cause." *Id.* at 617 (citing *Neal v. State*, 722 S.E.2d 765, 767–68 (Ga. 2012)).

The Court did consider Dr. Alpert's testimony, including his opinion that a PIT maneuver shouldn't be used on a fleeing vehicle going faster than 40 miles per hour. But it concluded that Calhoun's evidence merely "challenged Trooper Saddler's judgment in deciding to perform the PIT maneuver," which was insufficient to show that Saddler had broken the causal chain. *Id.* The Court also pointed out that Dr. Alpert was a sociologist "qualified as an expert on *police procedures*," not an expert on "actually performing the maneuver." *Id.* at 616–17 (quotation marks omitted).

The Supreme Court of Georgia determined that it was: "reasonably foreseeable — and not abnormal — that Calhoun's high-speed antics might cause another car — whether law enforcement or not — to strike Calhoun's vehicle or otherwise cause Calhoun to lose control of his vehicle, resulting in a catastrophic incident for Calhoun, his passengers, or occupants of other vehicles." *Id.* at 617. On the core state law issue that the ineffective assistance of counsel

claim depended on, the Supreme Court of Georgia's decision establishes that use of the PIT maneuver in this case was not an unforeseen intervening cause, meaning that Calhoun proximately caused Shore's death. *Id.* Any deficient performance on behalf of his counsel relating to proximate cause did not prejudice Calhoun. *Id.*

The Court also rejected Calhoun's argument that Brown was ineffective for failing to request a jury instruction on proximate or intervening cause. It held, as a matter of Georgia law, that "the jury was adequately instructed on causation with respect to felony murder," and "even if the jury had been presented with Calhoun's additional evidence and these [proposed] jury instructions, [the Court could not] say that a reasonable jury would have reached a different verdict." *Id.* at 617 n.3.

After losing in state court, Calhoun filed an application for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254, contending he received ineffective assistance of counsel at trial. The district court denied his application and denied him a certificate of appealability. We granted him one to determine:

> Whether the Georgia Supreme Court's rejection of Mr. Calhoun's ineffective assistance of counsel claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the state court record, *see* 28 U.S.C. § 2254(d).

**IV.**

"We review de novo a district court's denial of habeas relief on an ineffective-assistance-of-counsel claim, which presents a mixed question of law and fact." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc). For each claim for relief, we review "the last state-court adjudication on the merits." *Sears v. Warden GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quotation marks omitted). We presume the state court's findings of fact are correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

When reviewing § 2254 habeas applications from state prisoners based on claims previously decided by a state court on the merits, federal courts generally apply the "highly deferential standard[]" established under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Pye*, 50 F.4th at 1034 (quotation marks omitted). That standard "demands that state-court decisions be given the benefit of the doubt." *Sears*, 73 F.4th at 1279 (quotation marks omitted).

The exception to the rule of deference is that federal courts decide federal issues in habeas cases without deference to the state courts' decisions of those issues if the state court proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(1)–(2). If either of those exceptions is met, we are to decide for ourselves if Calhoun's ineffective assistance of counsel claims have merit. *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1249–50, 1255 (11th Cir. 2013).

Calhoun contends that the Supreme Court of Georgia's decision was contrary to or involved an unreasonable application of the federal ineffective assistance of counsel standard because that court misstated the standard in its analysis. He is right about that, although it doesn't entitle him to federal habeas relief.

## V.

For reasons we will explain, we agree with Calhoun that the Supreme Court of Georgia appears to have applied a stricter prejudice standard than the one mandated by the United States Supreme Court for claims of ineffective assistance of counsel. Accordingly, instead of applying AEDPA deference to its prejudice holding, we must decide that issue *de novo*. *See Adkins*, 710 F.3d at 1255. But, also for reasons we will explain, even a *de novo* review results in the self-evident conclusion that the Supreme Court of Georgia's statement and application of Georgia law on intervening cause was necessarily (one might say automatically) correct. Because of that state law applicable to this case, Calhoun has not carried his burden of persuading us there is a reasonable probability of a different result if counsel had done as Calhoun says he should have regarding an intervening cause defense; our confidence in the outcome of the trial has not been undermined.

A.

A state court determination is contrary to clearly established law if "the court arrived at a conclusion opposite to the one reached by the Supreme Court on a question of [federal] law." *Sears*, 73 F.4th at 1279. That happened here. The correct standard for ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). That progenitor decision (cited in more than 219,000 decisions so far) holds that to establish ineffective assistance a petitioner must show that his counsel's performance was outside the wide range of reasonable professional assistance and that deficient performance prejudiced his defense. *Id.* at 687.

*Strickland* also held that proving prejudice requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The Court cautioned that the reasonable probability standard was not a preponderance or likelihood standard and, as a result, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Ineffective assistance prejudice can exist "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694.

That is the problem with the Supreme Court of Georgia's statements about the prejudice issue involving the intervening cause question in this case. Its opinion states that: "nothing presented at [Calhoun's] hearing on the motion for new trial *would*

*have established* that the use of the PIT maneuver was an intervening cause," *Calhoun*, 839 S.E.2d at 616 (emphasis added), or that "a reasonable jury *would have reached* a different verdict," *id.* at 617 n.3 (emphasis added), or that counsel's errors *"likely affected the outcome* of the trial," *id.* at 615 (emphasis added) (quoting *Jones v. State*, 827 S.E.2d 879, 885 (Ga. 2019)), or *"affect[ed] the outcome* of Calhoun's trial," *id.* at 617 (emphasis added). All of those formulations are versions of the preponderance standard.

The proper prejudice standard is not preponderance. It's not what "would have" been established but for the error or deficiency of counsel, or what verdict the jury "would have reached" but for it, or whether it actually did "affect the outcome." Instead of a probability of a different result, there need be only a "reasonable probability" of a different result. The difference is whether it is more likely than not the result would have been different under the preponderance standard compared to whether there is enough possibility that there would have been a different result that the reviewing court's confidence in the outcome is undermined. *Strickland*, 466 U.S. at 694. The correct prejudice standard puts a lesser burden on the petitioner than the one the Supreme Court of Georgia stated. *See generally United States v. Watkins*, 10 F.4th 1179, 1183–84 (11th Cir. 2021) (en banc) (explaining that the reasonable probability standard is "a lesser showing" than a preponderance standard).

We know that this type of error ordinarily strips a state court decision of AEDPA deference because the Supreme Court told us

that it would in *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). There the Court gave an example of where a state court's decision would be contrary to clearly established federal law, disqualifying it from AEDPA deference. The Court's example was: "[i]f a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different." *Id.* That, the Court said, would make the resulting decision "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" within the meaning of 28 U.S.C. § 2254(d)(1). *See id.*

A word of caution, or actually a full paragraph of it, is appropriate here: The Supreme Court's decision in *Williams* and our decision today should not be misread to mean that a state court decision isn't entitled to AEDPA deference unless the opinion quotes with precision, without shorthand references, and with flawless consistency the proper federal standard of reasonable probability of a different result. The Supreme Court has made it clear that a perfectly articulated, non-flub, ambiguity-free discussion of the prejudice component is not required in a state court opinion for AEDPA deference to be due. *See Holland v. Jackson*, 542 U.S. 649, 654–55 (2004) ("[T]he statement [in the state court opinion] that respondent had 'failed to carry his burden of proving that the outcome of the trial would probably have been different but for those errors' . . . is permissible shorthand *when the complete* Strickland *standard is elsewhere recited*.") (emphasis added); *Woodford v.*

*Visciotti,* 537 U.S. 19, 23–24 (2002) ("The California Supreme Court's opinion *painstakingly describes the* Strickland *standard.* Its *occasional shorthand reference* to [the reasonable probability] standard by use of the term 'probable' without the modifier may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision.") (emphasis added); *Early v. Packer,* 537 U.S. 3, 8 (2002) (For a state court decision to be entitled to deference in a federal habeas proceeding, it "does not require citation of our cases — indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."); *see also Hall v. Head,* 310 F.3d 683, 700 (11th Cir. 2002) ("While [some of the state court's opinion] may be read to suggest that the state court required more certainty of a different outcome than *Strickland* requires, it nevertheless appears to us that the state court was *simply using abbreviated language* in making its findings, especially since *the state court opinion made abundantly clear that it applied exactly the right federal law.*") (emphasis added).

But that "close-enough" wrinkle in, or exception to, the *Williams v. Taylor* rule does not apply to the Supreme Court of Georgia decision in this case. It doesn't because the opinion that accompanied the *Calhoun* decision repeatedly stated and used the preponderance of the evidence/"would have" standard instead of the reasonable probability/confidence-in-the-outcome standard that *Strickland* mandates. This isn't a case where there was only the occasional use of shorthand references or abbreviated language for

the correct law and where the state court opinion elsewhere made "clear that it applied exactly the right federal law." *Hall*, 310 F.3d at 700. Nor is it a case where the state court did not expressly state the prejudice standard it was applying. Instead, the *Calhoun* opinion stated, several times, a prejudice standard that *Strickland* itself rejected and that *Williams v. Taylor* gave as an example of what would be clearly contrary to federal law.

For those reasons, we must treat the Supreme Court of Georgia's decision of the ineffective assistance of counsel claim as contrary to clearly established federal law, and we must decide the issue *de novo*. *See Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (when a state court applies the wrong standard in deciding an ineffective assistance of counsel claim, a federal habeas court is to decide the claim applying the correct standard); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016). Deciding the federal issue *de novo* does not mean that we decide *de novo* the state law issues that are bound up in the federal ones. Far from it. Instead, we still must honor any state supreme court's holdings on state law issues, even if they are decisive in a federal habeas or other proceeding.

## B.

In conducting our *de novo* analysis of the federal ineffective assistance of counsel claims, we will begin and end with the prejudice requirement.

It is undisputed that Calhoun led law enforcement on a long, extremely reckless, high-speed chase that endangered the lives of a

number of people and culminated in a crash in which one person lost her life.  *See* Part I, *supra*; *see also Calhoun*, 839 S.E.2d at 615. Calhoun does not dispute those material, historical facts.  What he does dispute is whether his wrongful and felonious conduct was the proximate cause of the death, instead of the PIT maneuver that officers used to end the chase being an intervening cause that broke the causal chain between his wrongful conduct and the death. While ineffective assistance of counsel is a federal constitutional claim, the proximate cause and intervening cause issues that are at the heart of the prejudice component of the federal constitutional claim are not federal issues but pure issues of Georgia law.  The State of Georgia can define proximate and intervening cause any way it wishes.  And when it comes to deciding how Georgia law defines those terms, there is one and only one court that's supreme. It's not this Court.  It's not even the United States Supreme Court.

1.

In fact, the Supreme Court itself has long and consistently held that a state supreme court is the "ultimate exposito[r] of state law," meaning that what it says about its own state law is without question that state's law.  *See Riley v. Kennedy*, 553 U.S. 406, 425 (2008) (alteration in original) (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)); *Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are . . . bound by the [state] Supreme Court's interpretation of state law, including its determination of the elements of [the statute of conviction]."); *Kennedy v. Louisiana*, 554 U.S. 407, 425 ("Definitive resolution of state-law issues is for the States' own courts

. . . ."), *modified on denial of reh'g*, 554 U.S. 945 (2008); *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."); *see also In re Cassell*, 688 F.3d 1291, 1292 (11th Cir. 2012) ("[T]he United States Supreme Court 'repeatedly has held that state courts are the ultimate expositors of state law.'") (quoting *Mullaney*, 421 U.S. at 691).

The Supreme Court has applied the principle of state high court supremacy over state law issues specifically to federal habeas review of state court convictions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("[V]iews of the state's highest court with respect to state law are binding on the federal courts."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Mullaney*, 421 U.S. at 690–91 (rejecting an argument "that the Maine Supreme Judicial Court's construction of state law should not be deemed binding on [the Supreme] Court since it marks a radical departure from prior law, leads to internally inconsistent results, and is a transparent effort to circumvent [a Supreme Court precedent]") (footnote omitted).

We have, of course, applied that same principle in many habeas decisions ourselves. *Jones v. GDCP Warden*, 753 F.3d 1171, 1191 (11th Cir. 2014) ("[A] state's interpretation of its own laws or rules

provides no basis for federal habeas corpus relief . . . .") (quotation marks omitted); *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1299 (11th Cir. 2017) ("[S]tate law is what the state courts say it is. As the Supreme Court and this Court have repeatedly acknowledged, it is not a federal court's role to examine the propriety of a state court's determination of state law.") (internal citations omitted); *Green v. Georgia*, 882 F.3d 978, 988 (11th Cir. 2018) ("On habeas review, federal courts may not second guess state courts on questions of state law. . . . Accepting the [state court's] interpretation of Georgia law, it was thus correct in holding that [the petitioner] did not suffer *Strickland* prejudice."); *In re Dailey*, 949 F.3d 553, 558 n.4 (11th Cir. 2020) ("The district court concluded that [the petitioner's] claim could also be read to assert that the state court committed an error of state law when it denied the claim during state post-conviction proceedings. It correctly held that such an argument was not cognizable in federal habeas proceedings.") (internal citations omitted); *cf. Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court, which is another way of saying that [a state's] law is what the [state] Supreme Court says it is.").

Because the Supreme Court of Georgia, after reviewing all of the evidence in Calhoun's case, held that under Georgia law Calhoun proximately caused Shore's death, *see Calhoun*, 839 S.E.2d at 616–17, that is the final answer to that state law question. Because it held that the PIT maneuver and the manner in which it was performed in this case was not an intervening cause, that is the final answer to that state law question. We have no authority to

question the Supreme Court of Georgia's determination about what constitutes proximate cause and what constitutes intervening cause and how the two fit together in Georgia law. *See Estelle*, 502 U.S. at 72 ("[O]ur habeas powers [do not] allow us to reverse [Calhoun's] conviction based on a belief that the [Supreme Court of Georgia] incorrectly interpreted" Georgia law). What the Supreme Court of Georgia says is Georgia law is Georgia law.

Police chases are dangerous; they often involve the fleeing vehicle and the officers in pursuit driving at dangerous speeds and breaking traffic laws. It is foreseeable that driving a fleeing vehicle in the perilously reckless way that Calhoun did would result in someone's death. It does not matter if performing the PIT maneuver was the best choice the officers had for ending the dangerous chase, or whether most officers would have performed the PIT maneuver at those high speeds.

What matters is that the Supreme Court of Georgia authoritatively decided as a matter of Georgia law that: "it was reasonably foreseeable — and not abnormal — that Calhoun's high-speed antics might cause another car — whether law enforcement or not — to strike Calhoun's vehicle or otherwise cause Calhoun to lose control of his vehicle, resulting in a catastrophic incident for Calhoun, his passengers, or occupants of other vehicles." *Calhoun*, 839 S.E. 2d at 617. The Supreme Court of Georgia also decided that any questions about the propriety or wisdom of using the PIT maneuver in the circumstances were insufficient for that maneuver to have been an intervening cause under Georgia law. *Id.* at 616–17.

Because it has been authoritatively and finally decided by the Supreme Court of Georgia that Calhoun proximately caused Shore's death under Georgia law, and that the use of the PIT maneuver was not an intervening cause of her death under Georgia law, any asserted errors or failures of trial counsel regarding those issues are not prejudicial: they do not undermine our confidence in Calhoun's conviction for felony murder. *See Strickland*, 466 U.S. at 694 (holding that to establish ineffective assistance prejudice a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome").

2.

In an attempt to undermine the Supreme Court of Georgia's decision of the Georgia law issues of proximate cause and intervening cause, Calhoun contends that in reaching its decision that court made multiple determinations of the facts about the PIT maneuver that were unreasonable within the meaning of 28 U.S.C. § 2254(d)(2). The Supreme Court of Georgia considered all of the evidence presented both at trial and in the motion for new trial. *See Calhoun*, 839 S.E.2d at 616–17. Not just the facts concerning the PIT maneuver, but also the undisputed facts about the 21-mile chase that Calhoun led the officers on, averaging speeds of 90 miles per hour and reaching 118 miles per hour at one point, weaving, swerving, using the emergency lane to pass cars, and causing a

patrol car to plow through the median to avoid running over someone.

Calhoun cites 28 U.S.C. § 2254(d)(2) as authority for his argument about the facts, but neither that nor any other provision in AEDPA supports the position that habeas relief is due. The only purpose and effect of § 2254(d)(2) is to strip a state court's decision on a federal constitutional claim of the deference that it would otherwise be due under the opening part of § 2254(d) and to thereby require *de novo* review. *See Sears*, 73 F.4th at 1295 ("[B]ecause we've already determined that [the state court decision] was based on an unreasonable determination of the facts . . . . we are unconstrained by § 2254's deference and must undertake a de novo review of the record.") (quotation marks omitted); *Cooper v. Sec'y Dep't of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2011) ("Thus, the state court's decision on prejudice was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' and we will review [the petitioner's] claim *de novo*.") (citation omitted). We are already giving Calhoun's ineffective assistance claim *de novo* review because of § 2254(d)(1), *see* Part V.A., *supra*; § 2254(d)(2) does not affect that.

It is important to distinguish between § 2254(d) conditional deference to a state court's decision of a federal claim, such as ineffective assistance of counsel, and what might be called "unconditional deference" to a state high court's decision of a state law issue in a federal habeas case. We *are not* applying the former; we *are* applying the latter. To be sure, absolute deference to holdings on

22-10313                 Opinion of the Court                          25

state law issues that are intertwined in a federal claim can determine the outcome of a federal habeas case. But the source of absolute deference to state supreme courts on state law issues does not come from § 2254(d) or any other AEDPA provision. It is grounded instead in fundamental tenets of federalism and the dichotomy of state and federal law that shapes our federal-state system. And it is compelled by the dozen or so decisions of the Supreme Court and this Court that are cited in Part V.B.1., *supra*.

3.

There is another problem with Calhoun's challenge to the Supreme Court of Georgia's proximate cause and intervening cause rulings. His strong focus on the wisdom, or lack of it, in the officers' use of the PIT maneuver in this case betrays a lack of understanding of proximate cause/intervening cause law in Georgia. That law does not depend on whether the most immediate or specific instrumentality of death was foreseeable, but on whether it was reasonably foreseeable that the result of the defendant's conduct might be catastrophic for someone through whatever immediate instrumentality produced it — *"whether law enforcement or not."* *Calhoun*, 839 S.E.2d at 617 (emphasis added). The focus of foreseeability in Georgia law is macro, not micro. The *Ponder* and *Smith* decisions show that, thereby refuting Calhoun's position. *See Ponder v. State*, 616 S.E.2d 857 (Ga. Ct. App. 2005); *Smith v. State*, 681 S.E.2d 161 (Ga. 2009). (And, of course, so does the decision of the Supreme Court of Georgia in Calhoun's own case.)

*Ponder* was an appeal involving a conviction for first degree homicide by vehicle. 616 S.E.2d at 858. Late one night while being chased by two police vehicles with their sirens and blue lights on, the defendant drove at speeds of 80 to 90 miles per hour with his headlights off, running several stop signs and side-swiping two vehicles along the way. *Id.* at 858–60. While chasing Ponder, Sergeant Scott drove his patrol car "into an uphill grade passing lane of the highway as if he intended to pass Ponder," and then made "a sudden evasive maneuver[] to avoid a collision between his and Ponder's vehicle and while doing so, lost control of his vehicle and collided with [an] oncoming" car driven by an innocent third party. *Id.* at 859. Sergeant Scott was killed in the collision. *See id.*

As a result of Scott's death, Ponder was charged with first degree homicide by vehicle, *see id.* at 858 & n.1, which is defined to include "caus[ing] the death of another person through" fleeing or attempting to elude a police officer. *See* Ga. Code §§ 40-6-393(a), 40-6-395(a). To sustain a conviction under that statute, the State had to prove "that the defendant's conduct was the proximate cause as well as the cause in fact, of the death." *Ponder*, 616 S.E.2d at 859 (quotation marks omitted). The Court of Appeals of Georgia explained what proximate cause means:

> An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage

> was either a direct result or a reasonably probable
> consequence of the act.

*Id.* Applying that standard, the Court upheld the conviction because "Ponder's actions of eluding an officer at high speed in a reckless manner played a substantial part in bringing about Sgt. Scott's death and . . . the death was a reasonably probable consequence of Ponder's actions." *Id.* at 860 (cleaned up). It reached that decision even though Sergeant Scott had pulled into an uphill passing lane at a high rate of speed and lost control of his car. *See id.* at 859. But for that the head-on collision with an oncoming car and Scott's death would not have happened. Still, the Court of Appeals held that Ponder's high-speed flight and recklessness was the proximate cause of Scott's death. *Id.* at 860. It did not hold that Scott's actions were an intervening cause.

Four years after the Court of Appeals of Georgia's *Ponder* decision, the Supreme Court of Georgia issued its *Smith* decision affirming a conviction for first degree homicide by vehicle, specifically for causing the death of another person while fleeing or attempting to elude an officer. *See Smith,* 681 S.E.2d at 162–63. An escaped prisoner driving a truck was being chased by a deputy sheriff in a patrol car with its blue lights flashing and siren going. *Id.* at 162; *see id.* at 163 (Hunstein, C.J., dissenting). The pursuit continued for three or four miles at 75 miles per hour, which was 20 miles an hour over the posted speed limit. *See id.* at 163 (Hunstein, C.J., dissenting). Both the fleeing prisoner and the pursuing deputy were running a red light while speeding through an intersection. *Id.* at 162.

The prisoner managed to prevent his truck from colliding with any of the other vehicles that were at the intersection. *See id.* But the deputy was driving so close behind the fleeing truck that he couldn't see in time whether there were any other vehicles at the intersection, causing his vehicle to crash into a car stopped at the red light. *Id.* The woman who was waiting for the light to change was killed. *See id.*

In his appeal, Smith contended that the facts did not establish the necessary proximate cause element of first degree homicide by vehicle. *Id.* at 162; *see also id.* at 163 (Hunstein, C.J., dissenting). Citing favorably the Court of Appeals' *Ponder* decision, the Supreme Court of Georgia rejected that argument and held that Smith's reckless flight was the proximate cause of the innocent motorist's death. *Id.* at 162. That holding in *Smith* necessarily establishes as a matter of Georgia law that the actions of the pursuing deputy in speeding toward the intersection when he couldn't see if there were any vehicles there, which resulted in a collision with a car stopped at the redlight, was not an intervening cause as that term is defined in Georgia case law. *See id.*

In *Smith* the Vehicle Pursuit Policy applicable to the deputy provided that he could exceed the speed limit during a chase only if he "exercises due regard for the safety of all persons," and he must terminate the pursuit if "the risk of continuing outweighs the danger of permitting the suspect to escape." *Id.* at 164 n.2 (Hunstein, C.J., dissenting). Yet, violations of those policies did not transform the pursuing deputy's driving into an intervening cause

that prevented defendant Smith's driving from being a proximate cause of the death. *See id.* at 162.

At oral argument, Calhoun's counsel attempted to distinguish *Smith* from this case by contending that the crash in *Smith* was an unavoidable accident while the crash caused in this case was not an accident because the officers intentionally used the PIT maneuver. But the deputy in the *Smith* case intentionally chose to follow closely behind the fleeing truck, and because of that deliberate choice he couldn't see the innocent motorist's vehicle stopped at the redlight until it was too late. *See id.* Both *Smith* and the present case involved actions that an officer intentionally took during a high-speed chase that endangered lives. In both cases the officers' actions contributed to a crash and a death. But in each case the Supreme Court of Georgia held as a matter of state law that the criminal recklessness of the fleeing driver, not the officer's actions, was the proximate cause of the death.

The Supreme Court of Georgia in this case held that "it was reasonably foreseeable — and not abnormal — that Calhoun's high-speed antics might cause another car — *whether law enforcement or not* — to strike Calhoun's vehicle or otherwise cause Calhoun to lose control of his vehicle, resulting in a catastrophic incident for Calhoun, his passengers, or occupants of other vehicles." *Calhoun*, 839 S.E.2d at 617 (emphasis added). Just as in *Smith*, proximate cause was established by dangerous and reckless driving in an effort to elude law enforcement. *See id.*; *see also Smith*, 681 S.E.2d at 162. And just as in *Smith*, the actions of the pursuing officer in

this case were not an intervening cause of the death, as "intervening cause" is defined in Georgia law.

Because Calhoun proximately caused his passenger Shore's death under Georgia law, he did not suffer prejudice due to any alleged deficiencies or errors of his trial counsel. He has not carried his burden of establishing a reasonable probability of a different result if his trial counsel had taken different actions regarding the proximate cause/intervening cause issue. Our confidence in the outcome of the trial is not undermined.

## VI.

For similar reasons we reject Calhoun's claim that his attorney rendered ineffective assistance of counsel by not requesting specific jury instructions on proximate and intervening cause. In rejecting this claim the Supreme Court of Georgia expressly held that the jury was adequately instructed on the applicable state law. *Calhoun*, 839 S.E.2d at 617 n.3. The words of the United States Supreme Court in another case fit well here: "The [state] Supreme Court expressly held that the jury instruction correctly set forth state law, and we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009) (citation omitted) (quoting *Estelle*, 502 U.S. at 67–68).

Alternatively, look at it this way. The most Calhoun could have been entitled to is instructions on what the Georgia courts have decided is the relevant state law on a subject. The law regarding proximate and intervening cause was determined in and stated

by the Georgia Court of Appeals in *Ponder* and by the Supreme Court of Georgia both in *Smith* and in Calhoun's own appeal. Given that law, and the undisputed facts of Calhoun's highly reckless behavior, which endangered the lives of many people, there is no reasonable probability of a different result had the jury been instructed precisely in accord with the decisions in *Ponder*, *Smith*, and *Calhoun*. Our confidence in the outcome of the trial is not undermined by any shortcoming in the instructions.

That conclusion necessarily follows from the Supreme Court's instructions in *Strickland* that when deciding whether a petitioner was prejudiced by an error of counsel: "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." 466 U.S. at 695. That's because "[a] defendant has no entitlement to the luck of a lawless decisionmaker." *Id.* That means "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker [would] reasonably, conscientiously, and impartially apply[] the standards that govern the decision." *Id.* We have no doubt about what any properly instructed jury reasonably, conscientiously, and impartially applying the legal standards governing proximate and intervening cause that were set out in *Ponder*, *Smith,* and *Calhoun*, would have found. It would have found that Calhoun proximately caused the death of Marion Shore, a passenger who had the misfortune to be riding in his car when he drove it with great recklessness and total disregard for human life, and it would have found that no tactic of law enforcement,

including the PIT maneuver, was an intervening cause under Georgia law.

## VII.

In essence, Calhoun asks us to decide that the Supreme Court of Georgia misunderstood and misapplied Georgia law. By definition, it did not do that. Calhoun's claims fail and he is not entitled to habeas relief.

**AFFIRMED**.